# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.:    1:19CR00610 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | JUDGE JOHN R. ADAMS |
| | ) | |
| MICHAEL A. PRITCHARD, | ) | **MEMORANDUM OF OPINION AND** |
| | ) | **ORDER ON MOTION TO SUPPRESS** |
| Defendant. | ) | |

## I.  INTRODUCTION

Currently pending before this Court is Defendant Michael A. Pritchard's ("Pritchard") Motion to Suppress, requesting that this Court suppress all evidence obtained as a result of the search of a disabled, abandoned vehicle conducted by the Ashtabula County Sheriff's Department on July 29, 2019. (Mot. to Suppress 1, ECF No. 12.) The government timely provided an opposition to Pritchard's motion. (Opp'n to Mot. to Suppress, ECF No. 16.)

A suppression hearing was held December 16, 2019, during which this Court heard argument from counsel, heard sworn testimony from Ashtabula County Sheriff's Department Deputy Leonard Emch ("Deputy Emch"), and exhibits were admitted regarding the events surrounding the search of the disabled, abandoned vehicle on July 29, 2019. (*See* Min. of Proceedings, Dec. 16, 2019.)

Given the evidence before this Court and a thorough analysis of the relevant, applicable law, this Court DENIES Pritchard's Motion to Suppress. The specific findings and reasoning of this Court are set forth in this Memorandum.

## II.  RELEVANT FACTUAL BACKGROUND

### A.  The Disabled, Abandoned Vehicle

At around 6:15 P.M. on July 29, 2019, the Ashtabula County Sheriff's Department dispatch contacted Deputy Emch to respond to a call regarding a suspicious vehicle, which was disabled and abandoned in Ashtabula County, Ohio – specifically on Shadyside Drive in Saybrook Township. (Suppression Hr'g Tr. 6:4-14, 6:24-7:1, 7:25-8:13, 8:18-9:1, 11:11-12:4, ECF No. 23; Suppression Hr'g Gov. Ex. 4 0:17-0:37. *See also* Mot. to Suppress Ex. A 1, ECF No. 12-1.) Dispatch informed Deputy Emch that the suspicious vehicle was described as a grey station wagon which had been disabled on Shadyside Drive for approximately three hours. (Suppression Hr'g Gov. Ex. 4 0:37-0:42.) In addition, dispatch informed Deputy Emch that the male driver of the vehicle had walked toward Lake Erie and hadn't been seen for approximately twenty minutes. (*Id.* at 0:48-0:54.) Finally, dispatch informed Deputy Emch that the disabled, abandoned vehicle had a Pennsylvania license plate, later confirmed to be a temporary tag, which did not return an owner name when searched. (*Id.* at 0:54-1:28; Suppression Hr'g Gov. Ex. 25.)

When Deputy Emch arrived to Shadyside Drive he observed the disabled, abandoned vehicle facing southbound, partially blocking a private driveway. (Suppression Hr'g Tr. 8:21-22, 9:2-8, 12:5-10, 28:11-13, 28:25-29:3, 29:14-23, ECF No. 23; Suppression Hr'g Gov. Ex. 23 0:00-0:15. *See also* Mot. to Suppress Ex. A 1, ECF No. 12-1.) Deputy Emch also observed that the portion of Shadyside Drive where the vehicle was disabled and abandoned is a short road where the southern end intersects with Lake Road and the northern end dead ends at a cliff that drops off to Lake Erie. (Suppression Hr'g Tr. 9:9-21, ECF No. 23. *See also* Mot. to Suppress Ex. A 1, ECF No. 12-1.) At approximately 6:34 P.M., immediately after his arrival to Shadyside Drive, Deputy Emch drove northbound on Shadyside Drive, past the disabled, abandoned vehicle and toward Lake Erie, exited

his vehicle, and began searching the area for the male driver. (Suppression Hr'g Tr. 12:12-18, ECF No. 23; Suppression Hr'g Gov. Ex. 5. *See also* Mot. to Suppress Ex. A 1, ECF No. 12-1.) Deputy Emch, not knowing specifically who he was looking for, did not find anyone by Lake Erie, so he drove southbound on Shadyside Drive, back to the disabled, abandoned vehicle and parked behind it. (Suppression Hr'g Tr. 12:19-13:4, ECF No. 23. *See also* Mot. to Suppress Ex. A 1, ECF No. 12-1.)

At this point, the individual who called in to the Ashtabula County Sheriff's Department to report the vehicle as suspicious, and an additional individual who lives on Shadyside Drive, spoke with Deputy Emch and informed him that the male driver of the disabled, abandoned vehicle had asked to charge his cell phone, a request which was refused. (Suppression Hr'g Tr. 13:4-24, ECF No. 23. *See also* Mot. to Suppress Ex. A 1, ECF No. 12-1.) The neighbors told Deputy Emch that after they refused to allow the male driver to charge his phone, he returned to the disabled vehicle and then came back to the neighbors to show them a Colorado driver's license as a demonstration that he was "an okay guy,"[1] but his request to charge his phone was still refused. (Suppression Hr'g Tr. 13:24-14:8, ECF No. 23. *See also* Mot. to Suppress Ex. A 1, ECF No. 12-1.) The neighbors told Deputy Emch that the male driver then walked away. (Suppression Hr'g Tr. 14:9-11, ECF No. 23.)

After the brief exchange with the neighbors, Deputy Emch approached the disabled, abandoned vehicle and provided dispatch with the vehicle identification number ("VIN") located on the front windshield. (*Id.* at 14:12-22, 15:4-5; Suppression Hr'g Gov. Ex. 6.) When searched, the VIN identified a Mr. Ricky Schuster as the registered owner of the vehicle with associated registered license plates KJM2004, which differed from the Pennsylvania temporary tag number located on

---

[1] The "an okay guy" quotation is from Deputy Emch's testimony, not necessarily a direct quote from the neighbors. (*See* Suppression Hr'g Tr. 14:1, ECF No. 23.)

the vehicle. (Suppression Hr'g Tr. 15:4-8, ECF No. 23; Suppression Hr'g Gov. Ex. 7; Suppression Hr'g Gov. Ex. 8; Suppression Hr'g Gov. Ex. 9.) Deputy Emch did not see license plate KJM2004 anywhere on or near the vehicle, he noticed that the Pennsylvania temporary tag expiration date had been altered, and he observed that the Pennsylvania temporary tag was attached to the back of the disabled, abandoned vehicle with a twig. (Suppression Hr'g Tr. 15:12-16:2, ECF No. 23; Suppression Hr'g Gov. Ex. 25. *See also* Mot. to Suppress Ex. A 1, ECF No. 12-1.) At this point Deputy Emch asked dispatch to reach out to Mr. Ricky Schuster at the address associated with the vehicle's VIN to verify where the vehicle was supposed to be. (Suppression Hr'g Tr. 15:7-11, ECF No. 23; Suppression Hr'g Gov. Ex. 10.)

Deputy Emch then looked in the vehicle's driver's side window and saw personal items, including a cell phone charger, cell phone, wallet, and key fob, on the driver's seat and a knife on the floorboard of the driver's side. (Suppression Hr'g Tr. 16:5-20, 17:9-18:16, ECF No. 23; Suppression Hr'g Gov. Ex. 2; Suppression Hr'g Gov. Ex. 3. *See also* Mot. to Suppress Ex. A 1, ECF No. 12-1.) Looking through the passenger's side window, Deputy Emch saw a digital scale on passenger's side floorboard. (Suppression Hr'g Tr. 16:21-24, ECF No. 23. *See also* Mot. to Suppress Ex. A 1, ECF No. 12-1.) After making these observations, Deputy Emch asked the neighbors he had previously spoken with how the male driver had been acting, to which the neighbors responded that the male driver acted suspicious or "off a little bit"[2] and had redness in his eyes and on the area surrounding his eyes. (Suppression Hr'g Tr. 16:25-17:8, 18:22-19:8, ECF No. 23. *See also* Mot. to Suppress Ex. A 1-2, ECF No. 12-1.) Deputy Emch then called his supervisor and expressed concern that he suspected the male driver was suicidal. (Suppression Hr'g Tr. 19:9-22, ECF No. 23. *See also* Mot. to Suppress Ex. A 2, ECF No. 12-1.)

---

[2] The "off a little bit" quotation is from Deputy Emch's testimony, not necessarily a direct quote from the neighbors. (*See* Suppression Hr'g Tr. 17:6, ECF No. 23.)

To be clear, at this moment in time, Deputy Emch did not know the identity of the male driver of the disabled, abandoned vehicle. What Deputy Emch knew, from his personal observations, was that a vehicle, bearing an altered Pennsylvania temporary tag which was held onto the vehicle by a twig, was disabled and had been abandoned on Shadyside Drive in such a way that it partially blocked a private driveway. Deputy Emch also knew from personal observation that the northern end of Shadyside Drive was a dead end with a cliff that dropped off to Lake Erie. Additionally, Deputy Emch observed personal belongings including a wallet, cell phone, key fob, and digital scale, left inside the disabled, abandoned vehicle.

But Deputy Emch was not armed with only his personal observations. Deputy Emch was told that the number of the Pennsylvania temporary tag found on the vehicle did not identify an owner when searched. Furthermore, the disabled, abandoned vehicle's VIN identified an owner who was associated with a different registered license plate number than that of the Pennsylvania temporary tag. Deputy Emch was also told that the vehicle had been disabled for approximately three hours and had been abandoned for approximately twenty minutes. In addition to the information relayed to Deputy Emch regarding the vehicle, Deputy Emch was told that the male driver of the vehicle was acting suspicious, had redness in and around his eyes, and was last seen walking toward Lake Erie.

Given Deputy Emch's years of police experience, specific training for dealing with suicidal individuals, the information relayed directly to him about the disabled, abandoned vehicle and its male driver, and his personal observations of the personal belongings left behind in the vehicle, including a digital scale, which is often associated with illegal drugs, Deputy Emch concluded that the male driver was possibly suicidal, or possibly under the influence of drugs which could enhance suicidal thoughts. (Suppression Hr'g Tr. 6:4-7:24, 19:9-21:11, ECF No. 23. *See also* Mot. to

Suppress Ex. A 2, ECF No. 12-1.) Deputy Emch, therefore, decided, with his supervisor's agreement, to enter the disabled, abandoned vehicle to attempt to identify the male driver. (Suppression Hr'g Tr. 6:4-7:24, 19:9-21:13, ECF No. 23. *See also* Mot. to Suppress Ex. A 2, ECF No. 12-1.)

### B. The First Entry – Identification of the Male Driver and Visible Pistol

When Deputy Emch first entered the disabled, abandoned vehicle, he located the wallet on the driver's seat, found the Colorado driver's license, and provided dispatch with the driver's license number. (Suppression Hr'g Tr. 21:3-22:1, ECF No. 23; Suppression Hr'g Gov. Ex. 11. *See also* Mot. to Suppress Ex. A 2, ECF No. 12-1.) As he was grabbing the wallet on the driver's seat, Deputy Emch looked to his right and saw the handle of what he believed to be a pistol sticking out of a bag in the back seat. (Suppression Hr'g Tr. 22:2-5, ECF No. 23. *See also* Mot. to Suppress Ex. A 2, ECF No. 12-1.) Deputy Emch grabbed the weapon, which was holstered, and placed it on the hood of his cruiser. (Suppression Hr'g Tr. 22:6-14, ECF No. 23. *See also* Mot. to Suppress Ex. A 2, ECF No. 12-1.)

Around this time, which was approximately 6:55 P.M., Pritchard called the Ashtabula County Sheriff's Department, identified himself, and admitted that he left a station wagon on Shadyside Drive. (Suppression Hr'g Tr. 22:15-23:17, 24:10-14, ECF No. 23; Suppression Hr'g Gov. Ex. 12 0:00-0:32; Suppression Hr'g Gov. Ex. 13 00:29-00:30.) Dispatch informed Deputy Emch that Pritchard had called in and was currently on the phone. (Suppression Hr'g Tr. 22:15-23:17, 24:10-14, ECF No. 23; Suppression Hr'g Gov. Ex. 13 0:00-0:13.) At this point, Deputy Emch read aloud to dispatch a license plate number from a license plate he could see in the back seat of the disabled, abandoned vehicle. (Suppression Hr'g Tr. 23:18-25, ECF No. 23; Suppression Hr'g Gov. Ex. 13 00:13-0:36.) However, despite being in the back seat of the disabled, abandoned vehicle, this

license plate was not associated with either the vehicle or Pritchard. (Suppression Hr'g Tr. 24:1-9, ECF No. 23; Suppression Hr'g Gov. Ex. 14.)

Deputy Emch then asked dispatch to ask Pritchard, who was still on the phone with dispatch, to return to Shadyside Drive. (Suppression Hr'g Tr. 25:15-19, ECF No. 23; Suppression Hr'g Gov. Ex. 15. *See also* Mot. to Suppress Ex. A 2, ECF No. 12-1.) In addition, Deputy Emch informed dispatch that he intended to tow the disabled, abandoned vehicle as it was a road hazard. (Suppression Hr'g Tr. 25:4-14, 25:20-21, ECF No. 23; Suppression Hr'g Gov. Ex. 16.) Dispatch informed Deputy Emch that Pritchard was sending his own tow truck to tow the vehicle, however, Deputy Emch confirmed with dispatch that, according to their searches, Pritchard was not actually the registered owner of the vehicle. (Suppression Hr'g Tr. 26:1-19, 27:1-17, ECF No. 23; Suppression Hr'g Gov. Ex. 17; Suppression Hr'g Gov. Ex. 18; Suppression Hr'g Gov. Ex. 21.) At this point, dispatch informed Deputy Emch that Pritchard was on his way back to Shadyside Drive and expected to arrive in ten minutes. (Suppression Hr'g Gov. Ex. 19; Suppression Hr'g Gov. Ex. 22.)

Again, by way of summary, once Deputy Emch entered the disabled, abandoned vehicle to identify the male driver, he obtained a Colorado driver's license from the wallet left in the driver's seat. As he did this, Deputy Emch noticed the handle of what he believed to be a pistol sticking out of a bag in the back seat. Deputy Emch secured the weapon by placing it on the hood of his cruiser.

Very coincidentally, nearly contemporaneously with Deputy Emch's entry into the disabled, abandoned vehicle, Pritchard contacted the Ashtabula County Sheriff's Department. Specifically, Pritchard identified himself, acknowledged that he abandoned a station wagon on Shadyside Drive, and engaged in back and forth conversation with dispatch, but not with Deputy Emch, regarding

towing the disabled, abandoned vehicle and whether he could, or would, physically return to Shadyside Drive. (Suppression Hr'g Gov. Ex. 12.) Notably, at this point, there is still nothing, besides Pritchard's own word relayed to Deputy Emch through dispatch, that Deputy Emch had at his disposal indicating Pritchard owned the disabled, abandoned vehicle. All Deputy Emch knew was that Pritchard was ten minutes away from Shadyside Drive and that the vehicle contained a knife and what appeared to be a pistol. (*See* Suppression Hr'g Tr. 27:18-28:3, ECF No. 23.) Of note, Deputy Emch was told at around 7:05 P.M. that Pritchard was returning to Shadyside Drive in ten minutes' time.[3]

### C. The Second Entry – The Protective Sweep

At approximately 7:08 P.M. Deputy Emch returned to the disabled, abandoned vehicle to execute a further search for any additional weapons, at which time he found a gallon sized plastic bag full of what he suspected was methamphetamine. (*Id.* at 28:2-13, 29:24-30:9, 30:14-19, 32:6-13; Suppression Hr'g Gov. Ex. 23 0:00-1:09. *See also* Mot. to Suppress Ex. A 2, ECF No. 12-1.) Upon making this discovery, Deputy Emch called dispatch and requested backup. (Suppression Hr'g Tr. 31:11-16, ECF No. 23; Suppression Hr'g Gov. Ex. 23 1:09-1:37. *See also* Mot. to Suppress Ex. A 2, ECF No. 12-1.) Deputy Emch then removed the weapon he believed to be a pistol, the one he had previously discovered in the vehicle, from its holster, and upon doing so discovered that the firearm was actually a BB gun. (Suppression Hr'g Tr. 31:17-32:5, ECF No. 23. *See also* Suppression Hr'g Gov. Ex. 23 1:37-2:15. *See also* Mot. to Suppress Ex. A 2, ECF No. 12-1.)

---

[3] This approximated time is indicated by the 6:55 P.M. communication between Deputy Emch and dispatch where dispatch informed Deputy Emch that Pritchard called in and was on the phone with dispatch (Suppression Hr'g Gov. Ex. 13), and the associated communication between dispatch and Pritchard which began around 6:55 P.M., lasted ten minutes and six seconds, and ended with Pritchard informing dispatch that he intended to return to Shadyside Drive in ten minutes' time (Suppression Hr'g Gov. Ex. 12).

At approximately 7:21 P.M. a tow truck arrived to Shadyside Drive. (Suppression Hr'g Tr. 33:5-18, ECF No. 23; Suppression Hr'g Gov. Ex. 23 13:55-14:15. *See also* Mot. to Suppress Ex. A 3, ECF No. 12-1.) Pritchard was not with the tow truck driver. (Suppression Hr'g Gov. Ex. 23 14:15-14:40. *See also* Mot. to Suppress Ex. A 3, ECF No. 12-1.) At approximately 7:41 P.M. Pritchard finally arrived to Shadyside Drive and interacted with Deputy Emch. (Suppression Hr'g Tr. 34:15-35:3, ECF No. 23; Suppression Hr'g Gov. Ex. 24 0:00-3:30. *See also* Mot. to Suppress Ex. A 3, ECF No. 12-1.)

## III.   LAW AND ANALYSIS – WARRANTLESS SEARCHES

The Fourth Amendment to the Constitution of the United States protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . ." U.S. Const. amend. IV. All told, "[t]he basic purpose of this Amendment, as recognized in countless decisions of [the Supreme] Court, is to safeguard the privacy and security of individuals against arbitrary invasions by government officials." *Taylor v. City of Saginaw*, 922 F.3d 328, 332 (6th Cir. 2019) (quoting *Camara v. Mun. Court of San Francisco*, 387 U.S. 523, 528 (1967)) (internal quotation marks omitted).

With respect to searches specifically, government conduct constitutes a search when the conduct "invades an area in which 'a person has a constitutionally protected reasonable expectation of privacy.'" *City of Saginaw*, 922 F.3d at 332 (quoting *Katz v. United States*, 389 U.S. 347, 360 (1967) (Harlan, J., concurring)). When analyzing whether a search under this standard occurred, physical intrusion into the area where an individual has a reasonable expectation of privacy is not always necessary. *City of Saginaw*, 922 F.3d at 332 (citing *Katz*, 389 U.S. at 360). However, when an invasion by a government actor is accompanied by a physical intrusion, this conduct is considered a search if the government actor: "(1) trespasses upon a constitutionally protected area,

(2) to obtain information." *City of Saginaw*, 922 F.3d at 332 (citing *United States v. Jones*, 565 U.S. 400, 404-05 (2012)).

There is no question that the government actor in this matter invaded, by physical intrusion, the disabled, abandoned vehicle to obtain information. Because automobiles are one such area where a person has a constitutionally protected reasonable expectation of privacy, albeit a lesser expectation of privacy than in one's person or home, a search clearly occurred. *See Cardwell v. Lewis*, 417 U.S. 583, 590-91 (1974) (explaining that "[o]ne has a lesser expectation of privacy in a motor vehicle" given its transportation function; however, "the exercise of a desire to be mobile does not, of course, waive one's right to be free of unreasonable government intrusion"). Since this threshold issue is clear, this Court must address whether the search of the disabled, abandoned vehicle was reasonable.

## A. Reasonableness

The language of the Fourth Amendment makes clear that the standard by which searches are judged is reasonableness. *See Cady v. Dombrowski*, 413 U.S. 433, 439 (1973) ("The ultimate standard set forth in the Fourth Amendment is reasonableness"); *Skinner v. Ry. Labor Execs.' Ass'n*, 489 U.S. 602, 619 (1989) ("the Fourth Amendment does not proscribe all searches and seizures, but only those that are unreasonable"). The general rule, therefore, is "a search of private property without proper consent is 'unreasonable' unless it has been authorized by a valid search warrant." *Camara*, 387 U.S. at 528-29. In other words, warrantless searches are presumptively unreasonable. *See Katz*, 389 U.S. at 357.

Therefore, when a criminal defendant seeks to suppress evidence obtained because a presumptively unreasonable warrantless search occurred in violation of his Fourth Amendment rights, the government bears the burden of demonstrating that the warrantless search was actually

reasonable by a preponderance of the evidence. *See United States v. Hynes*, 301 F.3d 669, 677 (6th Cir. 2002) (finding that the government bears the burden of proving the reasonableness of a warrantless search); *United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974) (making clear that "the controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evidence"). In turn, reasonableness is determined by balancing "the intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." *Maryland v. Buie*, 494 U.S. 325, 331 (1990) (citing *United States v. Villamonte-Marquez*, 462 U.S. 579, 588 (1983); *Delaware v. Prouse*, 440 U.S. 648, 654 (1979)).

There is no question that the search at issue in this matter was conducted without a warrant, and accordingly is presumed unreasonable. The narrow question before this Court, therefore, is whether the warrantless search of the disabled, abandoned vehicle was reasonable by a preponderance of the evidence.

1. Community Caretaker Exception

Of course, there are exceptions to the general rule that warrantless searches are presumed unreasonable. One such exception is the automobile exception, which occurs when a government actor searches a vehicle without a warrant, but with "probable cause to believe that the vehicle contains evidence of a crime." *United States v. Smith*, 510 F.3d 641, 647 (6th Cir. 2007) (quoting *United States v. Lumpkin*, 159 F.3d 983, 986 (6th Cir. 1998)) (internal quotation marks omitted). *See also Dombrowski*, 413 U.S. at 439 ("One class of cases which constitutes at least a partial exception to this general rule is automobile searches."). Although this exception is not applicable in the instant matter, it is instructive. As the exception demonstrates, automobiles, while considered "effects" within the meaning of the Fourth Amendment, do not carry the same weight under Fourth Amendment principles as other property - "whether a search and seizure is

unreasonable within the meaning of the Fourth Amendment depends upon the facts and circumstances of each case and . . . searches of cars that are constantly moveable may make the search of a car without a warrant a reasonable one although the result might be the opposite in a search of a home, a store, or other fixed piece of property." *Cooper v. California*, 386 U.S. 58, 59 (1967) (citing *Preston v. United States*, 376 U.S. 364, 366-67 (1964)).

The other important piece relevant to the search at issue in the instant matter is the recognition by the Supreme Court of the United States that local police officers often "engage in what, for want of a better term, may be described as community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Dombrowski*, 413 U.S. at 441. It is therefore reasonable that when a government actor is performing a community caretaking function, "rather than [a] traditional law-enforcement function[]," an exception to the Fourth Amendment warrant requirement is recognized. *City of Saginaw*, 922 F.3d at 335 (quoting *Ziegler v. Aukerman*, 512 F.3d 777, 785 (6th Cir. 2008)) (internal quotation marks omitted).

At the intersection of law enforcement's community caretaking functions and automobiles, the Supreme Court has acknowledged that local law enforcement often encounter "recurring practical situations that result[] from the operation of motor vehicles and with which local police officers must deal every day," such as automobile accidents, unoccupied vehicles on public streets, or even abandoned vehicles. *Dombrowski*, 413 U.S. at 446-47. Because "there is a constitutional difference between houses and cars" under the Fourth Amendment, where the expectation of privacy is diminished with respect to automobiles, and law enforcement officers routinely encounter noncriminal situations involving automobiles, logic dictates that the community caretaker exception "has been principally applied to the warrantless searches of automobiles." *United States*

*v. Lewis*, 869 F.3d 460, 463 (6th Cir. 2017) (quoting *Dombrowski*, 413 U.S. at 439); *Taylor v. Mich. Dep't of Nat. Res.*, 502 F.3d 452, 462 (6th Cir. 2007)) (internal quotation marks omitted).

Finally, in truth, the community caretaker exception necessitates careful consideration of the "function performed by a government agent when a search occurs." *City of Saginaw*, 922 F.3d at 335 (quoting *Hunsberger v. Wood*, 570 F.3d 546, 554 (4th Cir. 2009)) (internal quotation marks omitted). And although "the community caretaker exception does not provide the government with refuge from the warrant requirement except when delay is reasonably likely to result in injury or ongoing harm to the community at large," courts have also applied the exception to situations where "public safety is at risk." *City of Saginaw*, 922 F.3d at 335 (quoting *United States v. Washington*, 573 F.3d 279, 289 (6th Cir. 2009)) (internal quotation marks omitted).

After careful consideration of the function Deputy Emch performed when he first entered the disabled, abandoned vehicle, this Court can only conclude that Deputy Emch's initial warrantless search was reasonable under the community caretaker exception to the Fourth Amendment warrant requirement. When Deputy Emch entered the disabled, abandoned vehicle he reasonably believed that Pritchard, who, at this point, Deputy Emch only knew as the male driver of the vehicle, was suicidal and sought to identify him – an action that was "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Dombrowski*, 413 U.S. at 441. Deputy Emch's personal observations, coupled with his years of training and experience, and the information relayed to him from others guided him to this reasonable action.

Specifically, Deputy Emch personally observed the vehicle, which was disabled and abandoned on a road that ended at a cliff dropping off to Lake Erie. He observed several personal belongings left behind in the vehicle, including a wallet and cell phone – items that individuals

almost always carry on their person. Deputy Emch was told that the vehicle had been disabled for more than three hours and had been abandoned for approximately twenty minutes by an individual who was acting off, had redness in and around his eyes, and was last seen walking toward Lake Erie. His objectively reasonable belief was that he was dealing with a possibly suicidal individual.

Accordingly, when Deputy Emch entered the disabled, abandoned vehicle for the first time, his sole purpose was to identify an individual who he reasonably believed to be suicidal – he was not investigating a crime. Therefore, Deputy Emch was not, at least initially, engaged in traditional law enforcement functions and the community caretaker exception to the Fourth Amendment warrant requirement was properly invoked. This is particularly true because Deputy Emch's reasonable belief was that Pritchard's personal safety was at risk – a risk that was reasonably perceived as imminent and in which delay to obtain a warrant could have reasonably caused harm. Furthermore, Deputy Emch's initial intrusion into the disabled, abandoned vehicle was limited, which also weighs in favor of the conclusion that it was reasonable. *See Lewis*, 869 F.3d at 463 (combining the historical diminished expectation of privacy in an automobile with the limited intrusion taken by law enforcement when engaged in a community caretaker function to conclude that minimal intrusion weighs in favor of the reasonableness of a warrantless search).

Pritchard's focus on the fact that he was not specifically described as depressed or despondent and that he requested to charge his cell phone before he walked in the direction of Lake Erie does not cut deeply enough to dissuade this Court that the warrantless search was reasonable by a preponderance of the evidence. There is no formal requirement that an individual appear depressed or despondent to be suspected as suicidal. Furthermore, Pritchard could have asked to charge his cellphone for any number of reasons, including reasons that accompany suicidal thoughts, such as sending along final wishes or leaving behind a digital suicide note. Frankly, any number of reasons

for Pritchard's appearance and activities *could* be true. But entertaining myriad possibilities and engaging hindsight is improper. What is important is objective reasonableness, and Deputy Emch's belief that Pritchard was suicidal was objectively reasonable given the information available to him at the time he decided to perform a limited search of the disabled, abandoned vehicle without a warrant. *See Lewis*, 869 F.3d at 461 ("Fortunately, the Fourth Amendment does not impose technical prerequisites upon such a natural act of community service."). Because "[t]he standard of probable cause is peculiarly related to criminal investigations, not routine, non-criminal procedures," Deputy Emch's objectively reasonable belief is enough. *South Dakota v. Opperman*, 428 U.S. 364, 370 n.5 (1976).

Finally, Pritchard's attempts to persuade this Court that Deputy Emch improperly entered the disabled, abandoned vehicle because he could have done other things to identify Pritchard or help him – such as requesting backup to search for Pritchard or putting out a be-on-the-lookout-for alert with Pritchard's description – are similarly unconvincing. Again, this engages in hindsight questioning of Deputy Emch's community caretaking activity. In truth, "[t]he fact that the protection of the public might, in the abstract, have been accomplished by 'less intrusive' means does not, by itself, render the search unreasonable." *Dombrowski*, 413 U.S. at 447.

In sum, the community caretaker exception to the Fourth Amendment warrant requirement in conjunction with the diminished expectation of privacy that accompanies automobiles renders the initial search in this case reasonable. Deputy Emch was engaged in a community caretaker function, one completely unrelated to a traditional law enforcement function with respect to criminal activity, at the time he entered the disabled, abandoned vehicle based upon his objectively reasonable belief that Pritchard's safety was at risk. Therefore, Deputy Emch's initial, limited

search of the disabled, abandoned vehicle without a warrant was reasonable under the Fourth Amendment.

2. <u>Protective Sweep Exception</u>

The analysis of this case, however, does not end with the determination that Deputy Emch's initial warrantless entry into the disabled, abandoned vehicle was lawful because he entered the vehicle a second time without a warrant. The question now is whether the second warrantless entry into the disabled, abandoned vehicle was also reasonable under Fourth Amendment analysis. Deputy Emch asserts that his second entry into the disabled, abandoned vehicle was performed as a protective sweep – another exception to the Fourth Amendment warrant requirement.

Typically, a protective sweep "is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others." *Maryland v. Buie*, 494 U.S. 325, 327 (1990). However, with respect to automobiles, the protective sweep exception to the Fourth Amendment warrant requirement historically applies when a "suspect is not secured and might imminently reenter the car." *United States v. Lurry*, 483 F. App'x 252, 254 (6th Cir. 2012) (citing *Michigan v. Long*, 463 U.S. 1032, 1051 (1983)). In other words, Supreme Court precedent has "authorized a 'frisk' of an automobile for weapons" where an arrest has not occurred. *Buie*, 494 U.S. at 332 (citing *Long*, 463 U.S. at 1047). In so doing, the Supreme Court stated:

> . . . the search of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, is permissible if the police officer possesses a reasonable belief based on "specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant" the officer in believing that the suspect is dangerous and the suspect may gain immediate control of weapons.. . . "[The] issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger."

*Long*, 463 U.S. at 1049-50 (quoting *Terry v. Ohio*, 392 U.S. 1, 21, 27 (1968)).

Determining whether a law enforcement officer has a "reasonable, articulable suspicion" of danger is accomplished by examining the "individual factors, taken as a whole" and analyzing whether they "give rise to reasonable suspicion, even if each individual factor is entirely consistent with innocent behavior when examined separately." *United States v. Shank*, 543 F.3d 309, 314 (6th Cir. 2008) (quoting *United States v. Smith*, 263 F.3d 571, 588 (6th Cir. 2001)) (internal quotation marks omitted). While reasonable suspicion requires more than a mere hunch, an "officer need not be absolutely certain that the individual is armed." *Shank*, 543 F.3d at 315 (quoting *Terry*, 392 U.S. at 27) (internal quotation marks omitted). Law enforcement officers are permitted "to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person" and, therefore, "the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Shank*, 543 F.3d at 315 (quoting *United States v. Martin*, 289 F.3d 392, 398 (6th Cir. 2002); *Terry*, 392 U.S. at 27) (internal quotation marks omitted). Law enforcement officers face real situations that often require split-second decisions and there is, of course, no requirement that law enforcement "take unnecessary risks in the performance of their duties." *United States v. Walker*, 615 F.3d 728, 734 (6th Cir. 2010) (quoting *Terry*, 392 U.S. at 23) (internal quotation marks omitted). Finally, of note, whether the suspected weapon is legally or illegally possessed is immaterial, the focus, instead, is on officer and public safety. *Lurry*, 483 F. App'x at 255 (citing *Long*, 463 U.S. at 1052 n.16).

When Deputy Emch was informed that Pritchard was returning to Shadyside Drive, he had not yet discovered the bag of methamphetamine. What he had discovered, however, was a knife on the driver's side floorboard and what he believed to be a pistol sticking out of an open duffle bag in the back seat of the disabled, abandoned vehicle. Deputy Emch knew that the disabled,

abandoned vehicle was legally registered to a Mr. Ricky Schuster and was supposed to bear a registered license plate different than the altered Pennsylvania temporary tag that was held onto the vehicle by a twig. He had also seen a license plate in the vehicle that was not associated with either Pritchard or the disabled, abandoned vehicle.

Deputy Emch was in a situation where nothing was adding up. But even more, either by incredible coincidence, because Pritchard was watching Deputy Emch's activity from a distance, or because Pritchard was informed by a third party of Deputy Emch's activity, nearly contemporaneously with Deputy Emch's entry into the disabled, abandoned vehicle, Pritchard contacted the Ashtabula County Sheriff's Department to identify himself and acknowledge his involvement with the disabled, abandoned vehicle. This occurrence alone is enough to give any reasonable individual, law enforcement or otherwise, pause.

Pritchard's suspiciously timed phone call to the Ashtabula County Sheriff's Department coupled with the easily visible and readily available weapons Deputy Emch had already seen in the disabled, abandoned vehicle and the fact that Deputy Emch had no way of knowing when or from where Pritchard would arrive back to Shadyside Drive in totality give rise to a reasonable, articulable suspicion that his safety or the safety of the other individuals in the neighborhood was in danger. Therefore, for all these reasons, the protective sweep of the disabled, abandoned vehicle, during which Deputy Emch located the bag of methamphetamine, was reasonable, by a preponderance of the evidence, under the Fourth Amendment. Therefore, because both of Deputy Emch's warrantless entries into the disabled, abandoned vehicle were reasonable under the Fourth Amendment analysis, Pritchard's Motion to Suppress is DENIED.

**B.  Inevitable Discovery Doctrine**

Although Deputy Emch's searches of the disabled, abandoned vehicle were reasonable under the auspices of the Fourth Amendment, this Court would be remis if it did not mention that even without this determination, the evidence discovered in the disabled, abandoned vehicle could still not be suppressed as it would have inevitably been discovered during a lawful inventory search.

When a warrantless search is deemed unreasonable under the Fourth Amendment, the "exclusionary rule prohibits the admission of evidence seized" during the unlawful search. *United States v. Kennedy*, 61 F.3d 494, 497 (6th Cir. 1995) (citing *Wong Sun v. United States*, 371 U.S. 471, 484-85 (1963)). The inevitable discovery doctrine, however, provides an exception to the exclusionary rule by allowing "unlawfully obtained evidence to be admitted at trial if the government can prove by a preponderance that the evidence inevitably would have been acquired through lawful means." *Kennedy*, 61 F.3d at 497 (citing *Nix v. Williams*, 467 U.S. 431, 444 (1984)). More specifically, if "the government can demonstrate *either* the existence of an independent, untainted investigation that inevitably would have uncovered the same evidence *or* other compelling facts establishing that the disputed evidence inevitably would have been discovered," the inevitable discovery doctrine is properly invoked. *Kennedy*, 61 F.3d at 499 (emphasis in original). The burden of proof is met if the government can show "that routine procedures that police would have used regardless of the illegal search would have resulted in the discovery of the disputed evidence." *United States v. Ford*, 184 F.3d 566, 577 (6th Cir. 1999). *See also United States v. Garcia*, 496 F.3d 495, 506 (6th Cir. 2007) ("The doctrine applies where the facts indicate that the officers inevitably would have discovered and seized the tainted evidence by following 'routine procedures'") (quoting *United States v. Vite-Espinoza*, 342 F.3d 462, 466 (6th Cir. 2003)). Importantly, "[t]he inevitable discovery doctrine examines what would have transpired if the

warrantless search had not taken place, rather than what actually occurred." *United States v. Dillard*, 78 F. App'x 505, 513 (6th Cir. 2003).

In the instant matter, the government argues that even if Deputy Emch had never searched the disabled, abandoned vehicle, an inventory search of the vehicle would have led to the inevitable discovery of the methamphetamine. A reasonable inventory search, performed without a warrant, is yet another exception to the Fourth Amendment warrant requirement. *Colorado v. Bertine*, 479 U.S. 367, 371 (1987). *See also United States v. Smith*, 510 F.3d 641, 650 (6th Cir. 2007) ("A valid inventory search conducted without a warrant does not violate the Fourth Amendment"). In fact, "[t]he Fourth Amendment permits impoundment decisions and inventory searches that are objectively justifiable" so long as the discretion to impound "is exercised according to standard criteria and on the basis of something other than suspicion of evidence of criminal activity." *United States v. Kimes*, 246 F.3d 800, 805 (6th Cir. 2001) (quoting *Bertine*, 479 U.S. at 375-76) (internal quotation marks omitted). *See also Smith*, 510 F.3d at 651 ("In order to be deemed valid, an inventory search may not be undertaken 'for purposes of investigation,' and it must be conducted 'according to standard police procedures'") (quoting *United States v. Lumpkin*, 159 F.3d 983, 987 (6th Cir. 1998)). In general, deference is given to reasonable inventory searches because they "serve to protect an owner's property while it is in the custody of the police, to insure against claims of lost, stolen, or vandalized property, and to guard the police from danger." *Bertine*, 479 U.S. at 372.

In reality, an overlap exists between the community caretaker exception and the reasonable inventory search exception to the warrant requirement of the Fourth Amendment. Often, when executing a community caretaking activity, such as a lawful towing for example, a routine inventory search conducted according to standard police procedures is reasonable. *See South*

*Dakota v. Opperman*, 428 U.S. 364, 368-76 (1976) (inventory search of the glove compartment of an abandoned vehicle was reasonable); *Cooper v. California*, 386 U.S. 58, 62 (1967) (warrantless "search of a car validly held by officers for use as evidence in a forfeiture proceeding" held reasonable); *Harris v. United States*, 390 U.S. 234, 236 (1968) (explaining that the Fourth Amendment does not require a warrant in the narrow circumstance of searches conducted pursuant to police regulation, taken to protect the car while in police custody); *United States v. Decker*, 19 F.3d 287, 290 (6th Cir. 1994) ("a pre-forfeiture inventory search of a vehicle does not require a warrant"). Tying this all together, "[p]roof that contraband would have been detected in an inventory search that would inevitably follow seizure of a car is sufficient to invoke the inevitable discovery exception to the exclusionary rule." *Kimes*, 246 F.3d at 804. It is clear from the record that had Deputy Emch never initially entered the disabled, abandoned vehicle, it would have been towed and, pursuant to the Ashtabula County Sheriff's Department procedure, a lawful inventory search would have been conducted.

Besides the fact that the disabled, abandoned vehicle was parked on Shadyside Drive blocking a private driveway, the most persuasive indication that Deputy Emch would have had the vehicle towed even if he had never searched it was that Pritchard could not prove ownership of the vehicle. (Suppression Hr'g Tr. 35:25-36:9, ECF No. 23.) Although the VIN returned the name of an owner, it was not Pritchard. Furthermore, the license plate associated with the registered owner of the vehicle was not on the car. In addition, the Pennsylvania temporary tag that was on the car did not return an owner when searched. Besides Pritchard's word, Deputy Emch had no indication that Pritchard was the legal owner of the disabled, abandoned vehicle. Therefore, pursuant to Ashtabula County Sheriff's Department policy, Deputy Emch would have towed the vehicle because ownership was not verified. (Suppression Hr'g Gov. Ex. 1.) Deputy Emch would have also

conducted an inventory search of the vehicle prior to towing it, pursuant to Ashtabula County Sheriff's Department policy, as routine administrative procedure and clearly unrelated to the investigation of criminal activity, and inevitably would have discovered the methamphetamine. (Suppression Hr'g Tr. 27:9-17; 36:10-37:15. *See also* Suppression Hr'g Gov. Ex. 1.) Therefore, even if Deputy Emch's search of the disabled, abandoned vehicle had been unlawful under Fourth Amendment analysis, Pritchard cannot escape the evidence discovered in the vehicle as it would have inevitably been discovered. Pritchard's Motion to Suppress is therefore DENIED.

## IV. CONCLUSION

Deputy Emch's initial search of the disabled, abandoned vehicle was reasonable under the community caretaker exception to the Fourth Amendment warrant requirement. Deputy Emch's subsequent search of the disabled, abandoned vehicle was reasonable under the protective sweep exception to the Fourth Amendment warrant requirement. Therefore, the evidence discovered in the disabled, abandoned vehicle cannot be suppressed.

Finally, even if Deputy Emch had never performed the search of the disabled, abandoned vehicle, the evidence contained in the disabled, abandoned vehicle would have inevitably been discovered when the vehicle was lawfully towed as Pritchard could not verify ownership. Pursuant to administrative policy, and not to search for evidence of a crime, an inventory search would have been conducted prior to towing the vehicle, resulting in the discovery of the evidence.

For all of these reasons, as enumerated and thoroughly discussed throughout this Memorandum, Pritchard's Motion to Suppress is hereby DENIED.

IT IS SO ORDERED.

DATE: February 13, 2020                         /s/ John R. Adams
                                                Judge John R. Adams
                                                UNITED STATES DISTRICT COURT